Fabricant, J.
INTRODUCTION
This is an action in the nature of certiorari, pursuant to G.L.c. 249, §4, for review of a decision by the Boston Public School Department (“Department’’) to discharge two students from the Boston Latin School on the ground that they are not eligible to attend public school in Boston because they do not reside in Boston. [1] The plaintiffs contend that the decision is based on factual findings not supported by substantial evidence, and that it was made by a procedure that does not meet constitutional requirements of due process. After hearing, and review of the administrative record, the Court concludes that the decision must be vacated, and the matter remanded to the Department for further hearing.
BACKGROUND
The plaintiffs, Lydia and Andrew,[2] each applied for admission to the seventh grade at the Boston Latin School for the fall of 2003. Both applied as non-residents of Boston; Lydia lived in Arlington with both of her parents and her sibling, and Andrew lived in Lincoln with both of his parents and his sibling. Both students passed the qualifying examination, and received invitations for admission on the condition that they establish residency in Boston by July 31, 2003. Both student’s families took steps to meet that requirement; in each case, the family obtained housing in Boston for the student and one parent, and provided evidence thereof to the Department, in the form that each family understood to be required,based on information provided by the Department. The Department was initially satisfied, and both students enrolled.
Soon thereafter, however, information came to the attention of school officials that led the Department to conclude that the students were not residents of Boston. On December 2 and 3, 2003, the Department informed the students in person, and their parents by telephone, that the students were discharged from school, effective immediately. On December 4, the parents had a series of meetings with various school department officials, culminating in a meeting with the Chief Operating Officer for the school department, who affirmed that decision. He gave the parents written notice of the decision by letter dated December 9, 2003. The plaintiffs brought suit on December 12, 2003. On December 30, 2003, the Court (Burnes, J.), entered a preliminary injunction barring the Department from excluding the students pending decision on the merits, and set a schedule for further proceedings pursuant to Superior Court Standing Order 1-96 [17 Mass. L. Rptr. 272]. The Department has now filed its administrative record, and the parties have filed cross motions for judgment on the pleadings. The Department has also moved to strike certain materials that the plaintiffs seek to have considered as part of the record.
STANDARD OF REVIEW
The function of certiorari review under G.L.c. 249, §4, is to correct errors of law by tribunals not otherwise subject to review, where such errors are apparent on the record and adversely affect material rights. MacHenry v. Civil Service Comm’n, 40 Mass.App.Ct. 632, 634 (1996). Relief is warranted where a plaintiff demonstrates errors that are “so substantial and material that, if allowed to stand, they will result in manifest injustice to a petitioner who is without any other available remedy.” Johnson Products, Inc. v. City Council of Medford, 353 Mass. 540, 541 n.2 (1968), quoting Tracht v. County Commrs. of Worcester, 318 Mass. 681, 686 (1945). In a certiorari case, the Court is confined to the record of the proceedings below, and is not authorized to weigh evidence, find facts, exercise discretion, or substitute its judgment for that of the decision-making body. Rather, the Court is limited to determining whether the decision is legally erroneous. See Police Comm’r of Boston v. Robinson, 47 Mass.App.Ct. 767, 770 (1999); FIC Homes of Blackstone, Inc. v. Conservation Comm’n of Blackstone, 41 Mass.App.Ct. 681, 684-85 (1996).
The standard for certiorari review varies according to the nature of the action of which review is sought. Forsyth School for Dental Hygienists v. Board of Registration in Dentistry, 404 Mass. 211, 217 (1989); FIC Homes of Blackstone, Inc., 41 Mass.App.Ct. at 684. Where a decision is based on a factual determination, the Court may evaluate the evidentiary basis for that determination, since a decision based on facts not supported by substantial evidence is arbitrary and capricious. See generally Doherty v. Retirement Board of Medford, 425 Mass. 130, 135 (1997) (applying substantial evidence standard to review of retirement board decision imposing forfeiture of contributions); Konstantopoulos v. Whately, 384 Mass. 123, 136-37 (1981) (applying substantial evidence test to review of revocation of entertainment license). Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. In considering whether substantial evidence supports the facts found, the Court must examine the entire record *658 and take into account whatever fairly detracts from the weight of the conclusion reached. Doherty, 425 Mass, at 131; Pyfrom v. Commissioner of the Department of Public Welfare, 39 Mass.App.Ct. 621, 624 (1996). The Court may not, however, substitute its judgment for that of the administrative body under review; where the evidence could reasonably support conflicting conclusions, it is up to the administrative body, not the Court, to resolve the conflict. Doherty, 425 Mass, at 135, 141-42.[3]
In addition to evaluating the substantiality of the evidence, the reviewing Court may evaluate the adequacy of the procedure employed by the administrative decision-maker. A decision made by unlawful procedure is erroneous as amatter of law. Thus, for example, where constitutional, statutory, or regulatory requirements dictate provision of a hearing meeting some standard of adequacy, an administrative body’s failure to provide such a hearing is ground for reversal of the resulting decision, or for remand to the administrative body to provide the required hearing. See e.g. Drayton v. Comm’r of Correction, 52 Mass.App.Ct. 135, 139 (2001); Ford v. Comm’r of Correction, 27 Mass.App.Ct. 1127, 1128 (1989); see generally, Yerardi’s Moody Street Restaurant and Lounge, Inc. v. Board of Selectmen of Randolph, 19 Mass.App.Ct. 296, 302-03 (1985); compare G.L.c. 30A, §14(7)(d) (among grounds for review of state agency adjudicatory decisions is that decision is “made upon unlawful procedure”).
The decision in issue here is the Department’s determination that these students are not eligible to attend public school in the City of Boston under G.L.c. 76, §5. That statute provides: “Every person shall have a right to attend the public schools of the town where he actually resides.” The statutory language is mandatory, and grants no discretion to municipal officials; if a child resides in a municipality, he or she is entitled to attend its public schools. On judicial review, the Court’s role is to determine whether substantial evidence supported the Department’s factual determination, and whether the procedure by which the Department made that determination was lawful.
Before reviewing the record it is necessary to identify the proper composition of the record. The Department has submitted a set of materials that it contends constitutes the administrative record properly before the Court, on which certiorari review must be based. Those materials (items 1 through 5 of the Department’s filing) include a Department memorandum entitled “Boston Public Schools Residency Verification Procedure,” as well as affidavits of various Department officials recounting the process by which they made their decision, and the information they obtained and considered. Appended to those affidavits are copies of documents those officials obtained and considered.
The Department has also submitted, at the plaintiffs’ request, copies of five affidavits of the plaintiffs, with appended exhibits, that were not before the Department in the course of its decision, but were before the Court in connection with the motion for preliminary injunction (items 6 through 10 of the Department’s filing). Those affidavits recite facts regarding the residency issue that were not before the Department when it made its decision. They also present an account of the parents’ meetings and conversations with Department personnel that differ in some respects from the accounts provided in the affidavits of Department personnel. The Department, having submitted these affidavits upon the request of the plaintiffs, and in the interest of expedition, moves to strike them as not properly before the Court in an action for certiorari review.
As the authorities cited supra indicate, certiorari review is limited to the record of the proceedings before the administrative body. The Court’s role is to review the decision of the administrative body for legal error, not to make its own de novo factual determination. It follows that the Court cannot consider any evidence that was not before the administrative body. Thus, the plaintiffs affidavits must be stricken insofar as they seek to offer evidence or facts that were not presented to the Department.
Those portions of the plaintiffs’ affidavits that address the events that occurred in the administrative proceeding stand on somewhat different footing, but must be stricken as well. In a certiorari proceeding, it is the role of the respondent, not the petitioner, to establish the record. See Hershkoff v. Board of Registrars of Voters, 366 Mass. 570, 574 (1974); Loranger v. Martha’s Vineyard Regional High School District, 338 Mass. 450, 452-53 (1959); Newcomb v. Board of Aldermen of Holyoke, 271 Mass. 565, 567 (1930); Tewksbury v. County Comm’rs of Middlesex, 117 Mass. 563, 564-666 (1875). By submitting affidavits that in some respects contradict the Department’s version of the events that occurred in the administrative process, the plaintiffs seek to have to Court evaluate credibility and make factual determinations. The Court is not empowered to do so, but is limited to review of the record as submitted under oath by the responsible public officials. As the Court said in Tewksbury, supra at 565, “the rights of all persons have a sufficient protection, in being intrusted to public officers, clothed with important public duties, who are under oath for their faithful performance, and who cannot be supposed to have any interest or bias to misrepresent or suppress the actual facts as they took place before them.”
The plaintiffs have submitted an “opposition to Defendants’ Motion to Strike and Cross-Motion to Extend Return,” in which they urge the Court to receive their affidavits as an “extension” of the return, so as to fill in what they contend are gaps in the Department’s account of the administrative process. They cite Tracht, 318 Mass, at 686-87, and Morrissey v. State Ballot Law Commission, 312 Mass. 121, 126 (1942). The Court in those cases acknowledged that, *659 “[t]he remedy of the petitioners, if they deemed the return of the commissioners insufficient by reason of the omission of facts alleged in the petition, was to move for an amendment or extension of the return.” Morrissey at 126; see Tracht at 687. That language does not authorize petitioners in a certiorari action to submit extrinsic evidence in contradiction of the respondents’ return; indeed, the Court in Morrissey expressly rejected an effort to do exactly that. 312 Mass at 126. What is permitted, rather, is a motion for an order directing the respondent to amend or extend the return so as to include information or material that was actually before the administrative body at the time of the proceeding, but that the respondent has not included in the record.[4] The plaintiffs have not made any such motion in this case. The Court thus confines its review to the record as certified by the Department, consisting of items 1 through 5 of the Department’s filing.
THE FACTS
The record presents the following facts as to each of the students.
1. Lydia Ding
At or about the time Lydia enrolled at Boston Latin School, her parents executed a form entitled “Affidavit of Parent or Guardian of Non-Resident Student in Support of Admission to a Boston Public Schools Examination School.” The form, as filled out by the parents, listed both parents by name as her custodial parents, and recited that “I/we currently reside with Lydia Ding at 295 Commonwealth Ave, Boston MA.” The form set forth the parents’ acknowledgment and verification that “if neither my child nor I/we are found to be residents of the City of Boston on or after July 31,2003, my/our child will be expelled from Boston Latin for the remainder of the academic year. Any readmission to Boston Latin shall only be under such regular terms and conditions as exist for admission to Boston Latin School.” Lydia’s parents also submitted, as verification of residency, a telephone bill bearing Lydia’s father’s name,[5] the 295 Commonwealth Avenue address, and a 617 telephone number, dated July 14, 2003, showing charges through August 16, 2003. The charges shown on the bill consist of a standard monthly fee, with no charges for long distance service. This verification of residency apparently satisfied the Department of Implementation, which, under School Department Policy, “has responsibility for monitoring.... verification procedure”; Lydia was enrolled at the school.
In late September or early October of 2003, Boston Latin School’s Assistant Registrar, John Bunker, informed Assistant Headmaster Philip Haberstroh that Lydia and another student, referred to as David C., shared the same address at295 Commonwealth Avenue. To Haberstroh’s knowledge, according to his affidavit, Lydia and David C. “were not related and were not residing together.” On a school day at approximately 8:30 a.m., Haberstroh telephoned David C.’s father, according to Haberstroh’s affidavit, “at 295 Commonwealth Avenue.” David C.’s father told Haberstroh that he had rented a room to Lydia and her mother. Haberstroh asked to speak with Lydia’s mother; David C.’s father responded that she was not there. Haberstroh immediately telephoned a contact number he had for Lydia that began with a 781 area code and that he understood to be in Arlington. Lydia’s mother answered. Haberstroh asked why she was at an Arlington telephone number; she responded that she had returned to Arlington after Lydia had gone off to school. Haberstroh provided this information to Eleanor Adams, Program Specialist in the Student Assignment Office.
In around November 2003, Cornelia Kelley, Headmaster of Boston Latin School, received an anonymous letter, dated November 26, 2003, purporting to be from a Boston Latin School student, complaining about non-residents attending Boston Latin School. The letter listed Lydia, Andrew, and a third student, giving an Arlington address and telephone number for Lydia and a Lincoln address and telephone number for Andrew. In response to the letter, Kelley met with Haberstroh, and learned that he had already received information that these students did not live in Boston, and had referred the matter to Adams.
The same anonymous letter came to the attention of Michael Contompasis, Chief Operating Officer for the Department, on December 1, 2003. On December 2, 2003, Contompasis telephoned Kelley. Contompasis informed Kelley that he had received information that Lydia and Andrew did not reside in Boston. Kelley informed Contompasis that Haberstroh had already investigated and referred the matter to Adams. Contompasis instructed Kelley to withdraw the students from the school. Kelley delegated that task to Haberstroh.
On that same day, Haberstroh attempted to reach Lydia’s parents by telephone. He did not succeed in reaching them, but left a voicemail message saying that he needed to discuss an important matter with them regarding Lydia. In response, he received an e-mail from Lydia’s father at 11:57 a.m. that day. The e-mail stated “if it is a student residency related issue, I would like to inform you, by taking this opportunity, that we finalized our purchase of 31 Queensberry Street, Apt. 8, Boston.” The e-mail went on to provide information as to how to access the record of that transaction by internet, and then stated, “We will ask Lydia to bring to school two utility bills tomorrow as required.”
On December 3, 2003, Haberstroh spoke with Lydia’s father by telephone and, according to Haberstroh’s affidavit, “reiterated that Lydia D. was no longer permitted to attend Boston Latin School.” On the same day, Haberstroh spoke with Lydia in his office, and informed her “that there was a problem with her residency, and therefore, she would no longer be able to attend Boston Latin School.” He instructed her to return her textbooks to her teachers, have them sign withdrawal paperwork, and return the paperwork to the guidance office.
*660 That same day, Lydia’s father telephoned Maureen Lumley, Ombudsperson for the Boston Public Schools, to review the Department’s decision. Lydia’s father informed Lumley, according to her affidavit, that “My wife and I live in Arlington.” Later that day, he hand delivered to Lumley utility bills in his name for gas and electric service at 31 Queensbeny Street, Apt. 8, Boston. The statement from Nstar for electric service shows usage of 30 kilowatt hours for the month ending November 14, 2003, with a charge of $8.47. The statement also shows usage at that address in previous months, ranging from 143 to 212 kilowatt hours.[6] The statement from Keyspan for gas service shows usage of one therm for the period between October 24,2003 and November 13,2003, with a charge of $7.57. Lumley informed Lydia’s father that she agreed with the decision that Lydia did not reside in Boston, and that any further challenge would have to be addressed to Contompasis.
The next day, December 4, 2003, both Haberstroh and Kelley met with Lydia’s father. They also informed him that any further effort to challenge the decision would have to be directed to the administrative offices of the Boston Public Schools at 26 Court Street. On the same day, according to Contompasis’s affidavit, Contompasis met with Lydia’s parents for “well over an hour.” The parents informed Contompasis that they owned real estate in Arlington, and Lydia’s sibling was enrolled in an Arlington Public School; they had rented a room on Commonwealth Avenue in Boston, where Lydia and her mother stayed, but the family was still intact and the parents were not separated. The parents also told Contompasis that they had purchased property on Queensbeny Street in Boston in October of2003, but had not yet provided the Department with utility bills as proof of the new address because the mailbox key had been lost and they did not have access to the mailbox for an entire month. Contompasis, according to his affidavit, concluded from this information that the family “could not be receiving any important mail at the Queensbeny Street address.”
At the time of this meeting, Contompasis had in his possession, in addition to the anonymous letter, the following documents: (1) A Verification of Address Request Form, showing a request dated October 8, 2003, from Eleanor Adams, regarding Lydia. The form shows the address of 295 Commonwealth Avenue, with a 617 telephone number, and indicates “parent signed affidavit that they & Lydia live on Comm Ave. gave proofs of utilities in their name. Now they say they are renting a room for Lydia.” (2) The Affidavit of Parent or Guardian of Non-Resident Student in Support of Admission to a Boston Public Schools Examination School" form filled out by Lydia’s parents, as described supra. (3) A copy of the Verizon telephone bill for that address, as described supra. (4) A statement from Nstar, with the 295 Commonwealth Avenue address, bearing an account number but no name or date, and showing no charge. (5) A letter from Lydia’s father, dated December 1, 2003, addressed to both Contompasis and Haberstroh, referring to “my conversation with Mr. Haberstroh yesterday regarding Lydia Ding’s residency in Boston,” and informing them that “Lydia Ding’s address is 31 Queensbeny Street, Apt. 8, Boston. The deed was registered under my wife’s and my name and it can be verified" at a specified web site and telephone number. (6) The Nstar statement described supra. (7) the Keyspan statement described supra.
Upon review of these utility bills, according to Contompasis’s affidavit, “it was apparent to me that the Queensbeny Street address was not being occupied in any significant way by Lydia D. or her family because there was virtually no use of utilities during the period of time that Lydia D.’s father claimed Lydia D. and his wife had allegedly been occupying the property.” By letter dated December 9,2003, Contompasis informed Lydia’s father that he was affirming the decision that Lydia did not actually reside in Boston, and therefore was not permitted to attend Boston Latin School.
2. Andrew Tsai
In around late September or early October of 2003, Haberstroh received from a teacher at the school a cellular telephone the teacher had found in the building. The telephone had an entry for a telephone number entitled “home,” with a 781 area code. Haberstroh called that number, and Andrew’s father answered. Andrew’s father told Haberstroh that Andrew and his mother were living on lyier Street in Boston, with another family, specifically for the purpose of Andrew attending Boston Latin School, that the father and mother “would go ‘back and forth’ ” between the Tyler Street address and a home in Lincoln, Massachusetts, that the parents were not separated, and that the whole family as a unit was not living in Boston because Andrew’s sibling was attending public school in Lincoln. Haberstroh passed this information on to Eleanor Adams for further investigation or action.
In mid-November of 2003, one of Andrew’s teachers passed on to Haberstroh a check that Andrew had submitted to pay for a field trip. The check, dated November 17, 2003, lists the names of both of Andrew’s parents, with am address in Lincoln.
As recited supra, with respect to Lydia, upon receiving the anonymous letter, Kelley met with Haberstroh and learned of the information he had already obtained regarding Andrew. When Contompasis telephoned her on December 2, 2003, Kelley conveyed to him that the matter of Andrew, like Lydia, had already been investigated. As recited supra, at Contompasis’s direction, Kelley instructed Haberstroh to withdraw both students from the school.
Haberstroh telephoned Andrew’s mother, at the 781 number, between 10:00 and 11:30 a.m. on December 2, 2003. Haberstroh told Andrew’s mother that Andrew would not be permitted to attend the school because he does not live in Boston. The next day, December 3,2003, Haberstroh met with Andrew in his *661 office, and gave him the same information and instructions recited supra with respect to Lydia.[7]
On December 4, 2003, Haberstroh and Kelley met with Andrew’s parents and told them, as they told Lydia’s father, that any further challenge would have to be addressed to the Department administrative offices. In the course of the meeting, according to Haberstroh’s and Kelley’s affidavits, Andrew’s father informed them that the family was no longer renting on Tyler Street and was renting on Riverway Street in Boston. On the same day, Andrew’s mother telephoned Ombudsperson Maureen Lumley for review of the decision. After discussion, Lumley informed her that she agreed with the decision, and referred her to the Department’s legal advisor, Peter Kelley.
On that same day, Contompasis met with Andrew’s parents for over an hour. Andrew’s parents informed Contompasis that Andrew’s father and sibling live in Lincoln, that the sibling is enrolled in a Lincoln Public School, that Andrew and his mother had rented from July of 2003 until October of 2003 at 2 Tyler Street, Unit No. 4, and since October of 2003 on “Park Street” close to the school, and that Andrew and his mother live in the rented quarters five days per week. At the time of the meeting, Contompasis had in his possession a “Verification of Address Request Form” regarding Andrew from Eleanor Adams, dated October 6, 2003, listing the Tyler Street address. The form lists a telephone number with a 781 area code, and notes “child put this down as home phone. It is for Lincoln, MA address. Child lived there last year when he took the test.” By letter dated December 9, 2003, Contompasis informed Andrew’s father that he was affirming the decision that Andrew did not actually reside in Boston, and therefore was not permitted to attend Boston Latin School.
DISCUSSION
1. The Law of Residence
Before evaluating the Department’s decision, it is necessary to articulate the meaning, as a matter of law, of the statutory phrase “where he actually resides.” Residence is synonymous with domicile; “(b]oth terms indicate the place of one’s home or dwelling place.” Hershkoff, 366 Mass, at 576. “Every person must have a domicil, and he can have only one domicil at a time, at least for the same purpose.” Id. at 576. “Home is the place where a person dwells and which is the center of his domestic, social and civil life.” Id., quoting Restatement 2d; Conflict of Laws, §12 (1971). “A change of domicil takes place when á person with capacity to change his domicil is physically present in a place and intends to make that place his home for the time at least; ‘the fact and intent must concur.’ ” Hershkoff, 366 Mass, at 576-77, quoting Opinion of the Justices, 5 Met. 587, 589 (1843). “The realities of the circumstances do not give way to a contrary determination, no matter how dogged, to establish a different domicil.” Teel v. Hamilton-Wenham Regional School Dist, 13 Mass.App.Ct. 345, 349 (1982) (holding that the facts related by the plaintiff, “while overwhelmingly demonstrable of his desire to live in Hamilton, conclusively show that he and his family actually reside in Essex”).
The “he” in the statutory phrase “where he actually resides” is clearly the student, not his or her parents, guardians, or anyone else. “An unemancipated child, however, is generally said to lack capacity to acquire such a domicil of choice.” Hershkoff, 366 Mass, at 577. A child’s domicil “generally is the same as the domicil of the parent who has physical custody of the child.” George H. and Irene L. Walker Home for Children, Inc. v. Town of Franklin, 416 Mass. 291, 295 (1993). Exceptions to that general rule exist; parents may permit an older teenager to establish his or her own separate residence, or may place a child in the care of relatives or friends. See generally, Board of Education v. School Committee of Amesbury, 16 Mass.App.Ct. 508, 512 (1983) (discussing circumstances in which residence of parents may not determine residence of child, including “children living with . . . relatives or friends”); see also, In re Agawam Public Schools, BSEA#00-1395 (2000) (finding that child resided with grandparent in Agawam although mother, who had legal custody, resided in West Springfield). Here, however, the students are in seventh grade, certainly too young to have their own independent residences, and nothing before the Court suggests that their parents have entrusted their care to anyone else. Thus, their residence necessarily depends on that of at least one of each student’s parents.
2. Substantial Evidence
Having carefully considered the record, in light of the standards applicable in an action for certiorari review, the Court is of the view that the evidence on which the Department relied, with respect to both students, met the test of substantial evidence. The evidence did not compel the conclusion the Department reached in either case; it would have supported inferences contrary to those the Department drew. In a certiorari action, however, the Court is not empowered to choose between conflicting inferences; that role is for the administrative body. The Court must accept the inferences that body drew, as long as they are reasonable. They are in these instances.
With respect to Lydia, the evidence gathered by the Department indicated that her family lived in Arlington when she applied to the school, that her father and sibling continued to live there, that her parents’ marriage remained intact, and that her mother was located at the Arlington home on both of the two weekday mornings when the school attempted to reach her. The evidence further indicated that the family’s claim of Lydia’s residence in Boston rested on the rental of a single room in another family’s home for a period of time, and then the purchase of a condominium unit in which they did not receive mail and made minimal use of utilities, and the address of which the family did not provide to the school until some six weeks after its purchase. From this evidence, the Department could reasonably infer that, *662 even if Lydia and her mother were sleeping in Boston some of the time, even five nights a week as claimed, the family’s Arlington home remained “the center of [her] domestic, social and civil life.” Hershkoff, 366 Mass, at 576.
As to Andrew, the Department had evidence that he lived in Lincoln when he applied to the school; that his sibling continued to attend public school in Lincoln; that he carried a cellular telephone that listed as “home” the telephone number of the family home in Lincoln; that he had given that number and no other to the school as his home telephone number; that calls to that number during the school day reached both of his parents; that his parents’ marriage was intact; and that both parents continued to use checks bearing the Lincoln address. The evidence further indicated that the claim of residence in Boston rested on the rental of living space first in an apartment occupied by another family and then at another address; and that neither parent claimed actually to reside with Andrew in Boston, but rather that the two would go “back and forth” with him on week nights. As with Lydia, the evidence reasonably supported the inference that, even if Andrew slept in Boston five nights a week, accompanied by one parent or the other, the family’s Lincoln home remained “the center of his domestic, social and civil life.” Hershkoff, 366 Mass, at 576.
Notably absent from the record is any information indicating that any of the students’ parents had taken any of the steps that an adult would normally take upon a change of domicil, such as changing the address on his or her driver’s license, car registration, car insurance, voter registration, employment or bank records. Also absent is any information to indicate that the students or any of their parents had become involved in any civic, religious, cultural or social organization in Boston, that they had established relationships with health care providers in Boston, that they participated in any extracurricular activities in Boston, or that they adopted a practice of patronizing any shops or services in Boston. None of these things is required to establish residency, and some of them may be irrelevant to the particular circumstances of these individuals. But in light of the other evidence obtained by the Department, and the families’ awareness that the students’ residency was in issue, their failure to provide any information on these points supports the conclusion that the lives of these students and all of their parents continued to have their base at the family homes outside of Boston, just as they had before the students enrolled at Boston Latin School.
3. Due Process
The plaintiffs contend that the the manner in which the Department made its decision deprived them of procedural protections provided both by the Department’s own policy and by the Constitution. The Department responds that the policy invoked does not apply; that the plaintiffs, as non-residents of Boston, had no constitutionally protected interest in attending its public schools, so that no due process requirements apply; and that, in any event, the procedures followed satisfied constitutional due process requirements.
The policy the plaintiffs invoke is the Department’s policy regarding expulsions, as appearing in the “Boston Public Schools Policy Handbook for Parents & Students.” The handbook does not appear in the record. The plaintiffs have provided a portion of it, appended to an affidavit of Andrew’s mother. The portion provided sets out the procedure for expulsions, but does not include the portion of the handbook describing the circumstances to which those procedures apply. The Department, in its memorandum, asserts that the expulsion procedure appears under the heading “Code of Discipline,” and that the handbook describes the code of discipline as applying to “behavior of students while they are in school, at school sponsored activities and on their way to and from school.” The plaintiffs do not contest this assertion. That language establishes that the expulsion procedure provided in the handbook does not apply to these circumstances. Lydia and Andrew were not expelled for any reason related to their behavior. They were excluded from school based on a determination that they were ineligible to attend for lack of residency.
The plaintiffs also rely on the “Boston Public Schools Residency Verification Procedure.” The document referred to, contained in the record, is a memorandum from the Deputy Superintendent to school administrators, outlining the process by which student residency is to be verified. It provides that the Department of Implementation is to monitor verification of residency by school personnel, and is to be consulted when questions arise. It also specifies certain minimum requirements for documentation of residency under specified circumstances. Nothing in the document establishes a standard of residency different from the statutory standard, nor could it; the legislature has established the residency requirement, which is binding on all school districts. Nor does anything in the document convey any promise that a student’s residency will not be reexamined after provision of documentation upon enrollment, that the School Department will not look behind the documentation provided if questions arise, or that the Department of Implementation will have the final power to decide issues of residency. The memorandum provides no basis for any challenge to the Department’s authority to re-examine these students’ residency when questions arose, or to that of the Chief Operating Officer to make a final decision.
What remains is the constitutional requirement of due process. Where state law gives rise to an entitlement of some kind, a governmental decision that deprives an individual of the benefit of that entitlement is a deprivation of property within the meaning of the fourteenth amendment to the United States Constitution, as well as Article 10 of the Massachusetts Declaration of Rights. A person who is subjected to such a *663 deprivation is entitled to due process. See, e.g., Goss v. Lopez, 419 U.S. 565, 572-73 (1975) (disciplinary suspension from public school is deprivation of property and liberty interests for which due process is required); Board of Regents v. Roth, 408 U.S. 564, 577 (1972) (property interests triggering due process protections derive from state law); compare Allen v. Board of Assessors of Granby, 387 Mass. 117, 120 (1982) (no due process requirement for denial of tax abatement because no entitlement under state law).
Here, the Department had accepted these students as residents, and on that basis granted them places at Boston Latin School. If the students are indeed residents, then they are entitled by statute to retain those places, absent exclusion for disciplinary or academic cause. Once granted places at the school, they have a properly interest in continued enrollment. The Department is free to reexamine the factual basis for their entitlement, but it must do so by means of “fundamentally fair procedures.” Goss, 419 U.S. at 573; see Kraut v. Rachford, 51 Ill.App.3d 206, 214 (1977) (student excluded from school on residence grounds, after having previously attended that school for one year and been registered for a second, was entitled to due process).
The Department’s position on the due process issue, that the students have no property interest because they are not residents, makes the procedure turn on the outcome. The purpose of the procedure is to promote accuracy in outcome. The entitlement to procedural protections depends on the nature of the interest at stake, not on merits of the contest. See Goss, 419 U.S. at 574 (school is entitled to suspend for misconduct, but only based on “fundamentally fair procedures to determine whether the misconduct has occurred”). The interest at stake here is an entitlement under state law. That interest triggers due process protections.
The question, then, is “what process is due.” Id. at 577, quoting Morrissey v. Brewer, 408 U.S. 471, 481 (1970). Due process requires, ataminimum, “notice and opportunity for hearing appropriate to the nature of the case.” Goss, 419 U.S. at 579, quoting Mullane v. Central Hanover Trust Co., 339 U.S. 306, 313 (1950). “(T]he timing and content of the notice and the nature of the hearing . . . depend on appropriate accommodation of the competing interests involved.” Goss, 419 U.S. at 579. In that case, involving short-term disciplinary suspensions, the Court weighed the students’ interest in avoiding erroneously imposed discipline against the school’s interest in prompt imposition of warranted discipline. In that context, the Court ruled, due process requires that a student facing suspension receive “oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story.” Id at 581. Those requirements, the Court emphasized, are not elaborate or technical; notice and hearing may be immediate, provided that the student is told “what he is accused of doing and what the basis of the accusation is.” Id. at 581-82. The hearings required need notinvolve counsel, confrontation and cross-examination of witnesses, or other trial-fype procedures. Id at 583.
Here, the students’ interest is in avoiding an erroneous determination of non-residency, with consequent exclusion from a school they are entitled to attend. That interest is a strong one, although it bears noting that deprivation of that interest does not deprive them of all public schooling, even temporarily; if they are determined not to reside in Boston, then they are entitled to immediate enrollment in the school district where they do reside. The Department’s interest, on the other side of the scale, is in avoiding the burden of educating students not actually residing in Boston, preserving limited places at Boston Latin School for Boston residents, and preserving the credibility of the residency requirement. Those interests are strong, and require that, as a general matter, the Department be permitted to act promptly when it has reason to believe that an enrolled student does not meet the residency requirement.
The only decision the parties have identified that addresses the constitutionally required procedure for a school residency determination is Kraut, supra, 51 Ill.App.3d at 212-17. The issue arose there not in the context of judicial review of an administrative determination, but on a claim for damages under 42 U.S.C. §1983 for the alleged deprivation of due process in the exclusion of the plaintiff from school. The Court rejected the claim, holding that due process requirements had been satisfied where the plaintiffs mother had been notified of the decision soon after it was made, and had been given an opportunity to meet with the Director of Student Services and to provide additional information on the residency issue. The Court rgected the plaintiffs contention that due process required that the mother be informed of the “charges” made by the anonymous caller whose tip had triggered the school’s action; “unlike expulsion cases which involve allegations and proof of misconduct,” the Court observed, “there are no charges to be made in a residency case. There exists only a question as to the student’s residence... of which issue plaintiffs mother was apprised.” Id at 215.
In the circumstances presented here, and in the absence of any Massachusetts authority on point, this Court is of the view that the procedural standard established in Goss v. Lopez, 419 U.S. at 581-83, is appropriate to the competing interests presented.[8] Under that standard, the students’ parents were entitled to notice of the allegation that the students were not residents of Boston, some explanation of the basis for that allegation, and an opportunity to present their side.
The parents here were notified of the Department’s decision shortly before it was implemented. Although arguably the decision had actually been made the day before, the events that followed reveal that it remained open to challenge, upon presentation of further information. The timing thus appears inconsequential. See *664 Kraut, 51 Ill.App.3d at 214-15. The parents also had substantial opportunity to be heard; a series of school and Department officials met with them, up to and including the Chief Operating Officer. Nothing in the record indicates that they were prevented from providing any information they had available to prove the students’ residency.
What the parents did not receive, as far as the record discloses, is notice of the information the Department had gathered that led to its decision. Some of that information was obviously known to the parents, as they themselves had provided it; in that category are Lydia’s parents’ telephone and utility bills and affidavit form, and Andrew’s parents’ check. Some of the information, however, may not have been known to the parents, and was such that, had they known, they might have been able to explain or rebut. In that category are Andrew’s cell phone, his provision of the Lincoln telephone number as his home number, Haberstroh’s conversation with the father of David C., and the anonymous letter. This kind of information is not in the nature of charges, comparable to the charges of misbehavior involved in Goss v. Lopez, supra. See Kraut, supra, 51 Ill.App.3d at 215. Nevertheless, notice of the information would provide the parents a full opportunity to offer whatever explanation they may have, and would thereby enhance the accuracy of decision-making. See Goss, 419 U.S. at 580, quoting Joint Anti-Fascist Committee v. McGrath, 341 U.S. 123, 171 (1951) (“Secrecy is not congenial to truth-seeking”).
Because they did not receive notice of the basis of the allegation of non-residency, the plaintiffs did not receive due process. Accordingly the decisions under review must be vacated, and the matter remanded to the Department for further hearing. The narrowness of this decision bears emphasis. The Department is free to discharge these students from the school if, after a further hearing in compliance with due process, it finds that they did not actually reside in Boston as of the date of its previous decision, or at any other time since July 31, 2003.[9]
To comply with due process, the Department must notify the students’ parents of the date, time, and place of the hearing, and of the evidence that forms the basis for its contention that they are not residents. Of course, the parents now have full knowledge of the evidence that appears in this record; the Department need provide further notice only of any additional information it intends to consider. The hearing may be informal, consisting of a meeting with the decision-making official or his designee, at which the parents will be provided an opportunity to respond to the information the Department has, and to present any additional information they seek to have considered. No trial-type procedures are required, nor need a formal record be kept, although the keeping of some record, by tape recording or otherwise, would be advisable to facilitate any further review that may be sought
If the Department chooses to proceed further, it should do so promptly, so that all involved may make appropriate plans to minimize any further disruption in these students’ education. This Court will retain jurisdiction of the matter so as to expedite any request for review of any further decision.
CONCLUSION AND ORDER
For the reasons stated, the Defendants’ Motion to Strike is ALLOWED-, the Plaintiffs’ Motion for Judgment on the Pleadings is ALLOWED in part, as explained herein; and the Defendants’ Motion for Judgment on the Pleadings is DENIED. The decision of the Boston Public School Department to discharge the plaintiffs from the Boston Latin School is vacated, and the matter is remanded to the Department for further hearing consistent with this opinion. This Court will retain jurisdiction of this matter, and the case will be called for status conference on June 24, 2004, at 2:00 p.m.

The plaintiffs’ complaint invokes c. 249, §4 and asserts no other cause of action. The department responds on that basis. The Court similarly acts on that basis. See Hershkoff v. Board of Registrars of Voters of Worcester, 366 Mass. 570, 571 (1974) (certiorari review of decision denying voter registration on ground of non-residency); but see Teel v. HamiltonWenham Regional School Dist., 13 Mass.App.Ct. 345, 346 (1982) (in case raising issue of children’s residence for purposes of school attendance, Appeals Court recites facts “as they appear from the parties’ stipulation and [plaintiffl’s testimony”); Watson v. Town of Lexington, 1 Mass. L. Rptr. 261 (1993) (Judge decided residency issue for purposes of school attendance based on findings of fact after trial).

The record does not indicate any familial or other relationship between Lydia and Andrew. The Department has not challenged their joinder in this action.

In this respect, the Court’s role here is very different from the fact-finding role of the Bureau of Special Education Appeals in the decisions cited by the plaintiffs.

An example of this type of extension of the record may be seen in Hershkoff, 366 Mass at 574, where the Court approved the trial court’s extension of the Board’s return to admit a stenographic transcript of the testimony the petitioners had given before the Board.

The copy provided in the administrative record has the name redacted except for the initials “T” and “D.”

The statement has two entries with dates in August, one for August 13, for usage of 194, and one for August 29, for usage of 58. The statement also has two entries for October, one for October 14, for usage of 110, and one for October 24, with a figure in the usage column of 99970.

The record leaves unclear whether Haberstroh’s meetings with the students occurred jointly or separately.

The plaintiffs suggest that their procedural rights should be at least equal to those of a student expelled for misbehavior or whose presence poses a danger. The Court disagrees. Procedural protections depend on the interests at stake, not on the merits of the individual. Disciplinary expulsion, unlike exclusion for lack of residency, may deprive a student of all opportunity to a attend public school, see Board of Education v. School Committee of Quincy, 415 Mass. 240, 245-46 (1993), and also affects a student’s liberty interest in reputation. See Goss, 419 U. S. at 575.

If the students are now residents of Boston, but were not at any time since July 31, 2003, they are entitled to attend Boston public school, but not Boston Latin School.